These appeals are from a judgment based on directed verdicts for the defendants in consolidated breach of contract actions brought as a result of the delay in departure of an international charter flight from Birmingham, Alabama, to Europe.
Defendant Mable Forrester, d/b/a Sky III Enterprises and Ambassadors Abroad, organized a European charter tour and solicited the plaintiffs' participation in the tour through advertisement. As the tour operator, Forrester contracted with defendant Trans International Airlines (hereinafter "TIA") to provide a round-trip charter flight for the plaintiffs aboard TIA aircraft from Birmingham, Alabama, to Milan, Italy, and Athens, Greece.
The flight from Birmingham to Europe was scheduled to depart from the Birmingham airport at 12:30 p.m., March 11, 1979, but, because of mechanical difficulties with TIA's original chartered aircraft, as well as with a replacement aircraft, departure was delayed until approximately 8:30 p.m., March 12, 1979; a delay of about 32 hours. The flight to the European destinations, as well as the return flight to the United States, was uneventful. However, the plaintiffs' tour of Europe was shortened by the delay in departure.
As a result of the delay in departure, two separate classes of plaintiffs brought breach of contract class action suits against TIA and Forrester in the Circuit Court of Jefferson County, Alabama. The Newsome plaintiff class was originally represented by Virginia Newsome and is composed of the tour participants who were transported to Italy. The Kuechenmeister plaintiff class is represented by Craig Kuechenmeister, and is composed of the tour participants who were transported to Greece, following a stopover in Italy. The two cases were consolidated for trial and subsequently certified as class actions on October 6, 1981.
The plaintiffs sought compensatory damages for the delay of the TIA charter flight, alleging that the delay was a breach of the charter contract and resulted in the plaintiffs' missing valuable portions of their tour and substantially impaired the tour's value to them. Forrester cross-claimed against TIA, alleging that TIA had breached its contract of carriage with her by failing to furnish the tour transportation at the time agreed.
The consolidated actions proceeded to trial, and at the close of the plaintiffs' case the court granted TIA's motion for directed verdict on plaintiffs' breach of contract claim, as well as on Forrester's cross-claim. Forrester's motion for directed verdict against the plaintiffs' claims against her was also granted by the trial court. Following the trial court's denial of plaintiffs' motion for new trial, the plaintiffs filed timely notices of appeal to bring this matter before this Court. Forrester has not appealed the trial court's adverse ruling on her cross-claim.
The issue to be resolved is whether the trial court erred by directing verdicts in favor of TIA and Forrester on plaintiffs' contract claims. We are of the opinion that the trial court did err by granting a directed verdict for TIA, and we reverse its judgment as to TIA. We affirm the judgment based on the directed verdict for Forrester.
 I. TIA's Directed Verdict
The plaintiffs contend that the trial court erred in granting TIA's directed verdict *Page 594 
motion based upon the trial court's finding that there was no contract breach by TIA because of an alleged limitation of liability for delay provision incorporated by reference into the contract between TIA and the plaintiffs. We agree.
TIA and the plaintiffs are in agreement that the contract of carriage which is the basis of the plaintiffs' contract action against TIA is evidenced by the passenger ticket.[1] The passenger tickets issued by TIA for the plaintiffs' flight contained the following statement:
 To the extent not in conflict with the foregoing, carriage and other services performed by the carrier are subject to (1) the provisions contained in this ticket, (2) applicable tariffs and (3) carrier's Conditions of Carriage and related regulations which are made part hereof.
Section (2) of that statement incorporates into the contract by reference applicable tariffs that TIA is required to file with the Civil Aeronautics Board (C.A.B.).[2] See
14 C.F.R. § 382 et seq. Once a tariff is filed with the C.A.B., it becomes a part of the contract of carriage. Eastern Airlines v.Williamson, 282 Ala. 421, 211 So.2d 912 (1968).
Pursuant to C.A.B. requirements, TIA had in effect certain rules contained in a charter tariff filed with the C.A.B. and in effect at the time of the plaintiffs' flight. Central to the trial court's decision was Rule No. 20 (b) of TIA's Charter Tariff, which states:
 Departure Flight Delays: In the case of flight delays of more than forty-eight (48) hours beyond the departure time stated in the charter contract, TIA, upon request and at the charterer's option, will provide alternative air transportation at no additional cost to the charterer.
TIA promulgated this tariff to meet requirements of C.A.B. regulations codified at 14 C.F.R. § 208.32 (a) (1985). Section 208.32 (a) reads in pertinent part:
 Flight delays and substitute air transportation (foreign). Charter air carriers shall comply with the following requirements for passenger service in foreign air transportation. These requirements shall be without prejudice, and in addition, to any other rights or remedies of passengers under applicable law:
 (a) Substitute air transportation. (1) On all charter flights, unless the air carrier causes an aircraft to finally enplane each passenger and commence the takeoff procedures at the airport of departure before the 48th hour following the time scheduled for the departure of such flight, it shall provide substitute transportation in accordance with the provisions of this paragraph.
 (2) As soon as the air carrier discovers, or should have discovered by the exercise of reasonable prudence and forethought, that the departure of any such charter flight will be delayed more than 48 hours, such air carrier shall arrange for and pay the costs of substitute air transportation for the charter group on another charter flight, operated by any other carrier or foreign air carrier.
 (3) When neither the charter transportation contracted for nor substitute transportation has been performed before the expiration of 48 hours following the scheduled departure time of any such charter flight, the charterer, or his duly authorized agent, may arrange for substitute *Page 595 
air transportation of the members of the charter group, at economy or tourist class fares, on individually ticketed flights and the chartered air carrier shall pay the costs of such air transportation to the substitute air carrier or foreign air carrier.
 (4) In determining the period of time during which the departure of a charter flight has been delayed within the purview of this paragraph, periods of delay caused by the prohibition of flights to or from the airport of departure because of weather or other operational conditions affecting such airport shall be excluded if, and while, the air carrier has available an airworthy aircraft which is capable of transporting the charter group in a condition of operational readiness.
TIA contends that once its tariffs are filed with the C.A.B., the tariffs are the exclusive provisions by which the rights and liabilities of the carrier and passengers are governed. SeeTishman Lipp, Inc. v. Delta Airlines, 413 F.2d 1401 (2d Cir. 1969).
Based upon the foregoing facts and principles, TIA argued to the trial court, and argues again here, that TIA's tariff, filed pursuant to 14 C.F.R. § 208.32 (a) and incorporated into TIA's contract of carriage, exclusively limits TIA's liability for the flight delay experienced by the plaintiffs in the instant case to providing substitute air transportation and incidental expenses, if, but only if, the flight delay is 48 hours or longer. The delay of the TIA charter at issue here was only about 32 hours, and, therefore, TIA asserts that there was no breach of the contract with plaintiffs and that a directed verdict was in order.
The trial court stated in the record:
 The Court's of the opinion, whether I agree with it or not, that this is an area that is controlled by the Federal Regulations because of the commerce aspect of it and interstate commerce. And that the regulations, the tariff, and the operation of law operating together provide that the carrier, in this case TIA, is not liable for flight delays of departure as provided by this contract for less that 48 hours under the circumstances that have been shown here. The motion for directed verdict for TIA is granted.
The plaintiffs contend that the trial court erred in its ruling because (1) the C.A.B. regulation at 14 C.F.R. § 208.32 (a) is not intended to be the exclusive remedy afforded to the plaintiffs in this action, but is in addition to remedies recognized under federal treaty law and state common law; and (2) 14 C.F.R. § 208.32 (a) cannot be the exclusive remedy for defendants' breach of contract claim because the remedy would be in fatal conflict with the terms of the Warsaw Convention[3]
— a federal treaty which supersedes any conflicting tariff filed pursuant to C.A.B. regulations.
 A. Exclusivity of Remedy
We are of the opinion that the 48-hour provision of 14 C.F.R. § 208.32 (a), which was essentially incorporated by reference into TIA's contract of carriage by the tariff provision filed with the C.A.B., is not the exclusive remedy afforded to plaintiffs in the instant case, but, rather, that the provision allows the plaintiffs additional rights that may arise from federal treaty or state common law. The provision at 14 C.F.R. § 208.32 (a) was promulgated pursuant to authority granted by the Federal Aviation Act, Pub.L. 85-726, 72 Stat. 737 (1958) (codified as amended at 49 U.S.C. § 1301 et seq. (1976)). A federal administrative regulation should be construed so as to carry out the intent of the enacting body. United States v.Miller, 303 F.2d 703, cert. denied, 371 U.S. 955, 83 S.Ct. 507,9 L.Ed.2d 502 (9th Cir. 1962). Section *Page 596 
1106 of the Federal Aviation Act provides: "Nothing contained in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies." 49 U.S.C. § 1506 (1976). The Court in Brunwasser v. Trans World Airlines,Inc., 541 F. Supp. 1338, 1345 (W.D.Pa. 1982), made the following observation about § 1506:
 While federal regulation of air travel is extensive[,] it is not exclusive. Quite the contrary[,] federal law specifically preserves legal remedies for air travelers beyond those set forth in the Federal Aviation Act. . . . [49 U.S.C. § 1506] recognizes that the statutory scheme established by the Federal Aviation Act is designed merely to complement existing statutory and common law remedies, not to supplant them. Moreover, it is clear that 49 U.S.C. § 1506 applies to remedies arising under state law as well as those created by federal law.
To hold that 14 C.F.R. § 208.32 (a) is an exclusive remedy for delays in international charter flights would directly conflict with the clear Congressional intent expressed in § 1506. Surely, the C.A.B. in promulgating the regulation did not intend to create such an obvious conflict. Moreover, we are obligated to look to the plain meaning of the regulation's language in construing its effect. United States v. Miller,supra. The second sentence of § 208.32 (a) specifically states:
 These requirements shall be without prejudice, and in addition, to any other rights or remedies of passengers under applicable law.
We can reach no other conclusion than that the remedy provided in § 208.32 (a) is cumulative to other rights and is not exclusive.
In addition, a court, whenever possible, should avoid a construction of a regulation that would raise doubt as to the regulation's validity or hinder its ability to make its statutory authority operative. Northern Natural Gas Co. v.O'Malley, 277 F.2d 128 (8th Cir. 1960). As will be discussed below, a holding that the remedy embodied in 14 C.F.R. § 208.32 (a) is exclusive would create a conflict with the Warsaw Convention, a duly entered self-executing federal treaty, TransWorld Airlines, Inc. v. Franklin Mint Corp., 466 U.S. 243,104 S.Ct. 1776, 80 L.Ed.2d 273 (1984), that is, the supreme law of the land. U.S. Const. Art. VI; see also Butler's Shoe Corp. v.Pan American World Airways, Inc., 514 F.2d 1283 (5th Cir. 1975).
 B. Conflict With Warsaw Convention
The application of the Warsaw Convention to international flights is governed by the contract of carriage between the carrier and passenger, and, as previously mentioned, the contract of carriage between the plaintiffs and TIA in the instant case is evidenced by the passenger ticket.[4] See In ReCrash in Bali, Indonesia, 462 F. Supp. 1114 (C.D.Cal. 1978). The passenger tickets in the instant case expressly incorporated the terms of the Warsaw Convention by the following language:
 WARSAW CONVENTION. Carriage hereunder is subject to the rules and limitations relating to liability established by the Warsaw Convention unless such carriage is not "International Carriage" as defined by that Convention.
There is no dispute that the plaintiffs' flight was "international," as that term is defined by Article 1, (2), of the Convention. We must now determine what effect the application of the Convention has upon the liability limitations embodied in TIA's tariffs *Page 597 
that were incorporated by reference into the passenger tickets.[5]
The plaintiffs contend that the Warsaw Convention provides a cause of action against TIA and that Article 19 of the Convention makes TIA liable for damages occasioned by all delays in the transportation of passengers unless TIA proves that it took all necessary measures to avoid the damage or that it was impossible for the airline to take such measures, as is provided in Article 20, (1), of the convention.[6] The plaintiffs contend that the trial court's application of 14 C.F.R. § 208.32 (a) to limit TIA's liability for flight delays to providing alternate transportation and incidental expenses, and, then, only if the original departure time is delayed by 48 hours or more, was error, because, they argue, such a limitation of liability flies in the face of the liability imposed by Article 19 and the prohibition of liability limitations set out in Article 23 of the Convention.
TIA argues that the remedy embodied in 14 C.F.R. § 208.32 (a) is not inconsistent with Article 19 of the Convention, but is a consistent supplementation permitted by the Convention and envisioned by the Convention drafters. TIA asserts that the Convention does not define "delay," as that term is used in Article 19, and that the various states that have ratified the Convention are free to specify and define what *Page 598 
constitutes "delay" under Article 19. TIA contends that the C.A.B. has, in effect, through 14 C.F.R. § 208.32 (a), defined "delay" to be failure to depart within 48 hours of the appointed departure time. Therefore, TIA argues, the reference to 14 C.F.R. § 208.32 (a) in TIA's tariff, incorporated into the contract of carriage, precludes any remedy for its passengers until more than 48 hours has passed from the scheduled departure times.
Although we agree with TIA that 14 C.F.R. § 208.32 (a) is not inconsistent with the provisions of the Warsaw Convention, we are unable to accept the strained construction of the regulation put forward by TIA. Neither the unambiguous language of Article 19 of the Convention nor the language of the regulation supports TIA's contention that 14 C.F.R. § 208.32 (a) can, or that it in fact does, define "delay" so as to, in effect, limit TIA's liability.
We have carefully analyzed the minutes of the Convention pertaining to the adoption of Article 19, and the discussions rendered therein do not lead us to conclude that the delegates intended that Article 19 be supplanted in the fashion contemplated by TIA. However, we pretermit a lengthy and complicated discussion addressed to this point by simply observing that the clear language of 14 C.F.R. § 208.32 (a) does not define, nor does it reflect an intention to define, the term "delay." As previously noted, § 208.32 (a) states: "These requirements shall be without prejudice, and in addition, to any other rights or remedies of passengers under applicable law."
We have previously concluded that the Warsaw Convention applies to the facts of the instant case, and, therefore, we must conclude that the plaintiffs are free to assert any rights or remedies available to them pursuant to the Convention or other applicable law, regardless of the remedy afforded by 14 C.F.R. § 208.32 (a). The trial court erred by granting TIA's directed verdict motion.
 C. Preclusion of Common Law Remedies
In light of our determination that the Convention is applicable in the instant case, what remedies are afforded plaintiffs by the Convention and by state common law?
Plaintiffs argue that despite the applicability of the Warsaw Convention and 14 C.F.R. § 208.32 (a) to the case at bar, these provisions do not preclude the plaintiffs from asserting a common law cause of action for breach of contract. We disagree.
The issue here was addressed by the Fifth Circuit Court of Appeals in Boehringer-Mannheim Diagnostics, Inc. v. PanAmerican World Airways, 737 F.2d 456, 458 (5th Cir. 1984). The issue was framed in that case as:
 [W]hether the Convention provides the exclusive liability remedy for international air carriers by providing an independent cause of action, thereby preempting state law, or whether it merely limits the amount of recovery for a cause of action otherwise provided by state or federal law.
The Boehringer court joined the Courts of Appeals for the Second, Third, and Ninth Circuits in holding that the Warsaw Convention creates a cause of action and is the exclusive remedy. See Benjamins v. British European Airways, 572 F.2d 913
(2d Cir. 1978); Abramson v. Japan Air Lines Co., 739 F.2d 130
(3d Cir. 1984); In re Mexico City Air Crash of October 31,1979, 708 F.2d 400 (9th Cir. 1983). The result of these recent holdings is to make the theories of recovery and limitations of liability set out in the Convention exclusive, thereby preempting state common law causes of action in situations in which the Convention applies. When the Convention does not apply, liability and damages limitaitons are established in accordance with common law rules. These holdings were predicated upon the courts' recognition that the Convention was intended to be a binding uniform international body of air law and the conclusion that a uniform and consistent theory of liability embodied in a cause of action founded upon the Convention itself is consistent with the Conventions' goal of uniformity. *Page 599 
We are persuaded by the consistent position taken by the courts of the several circuits that have addressed this issue, and, in the absence of any direct holding on this issue by the Eleventh Circuit Court of Appeals, we are inclined to follow the decisions of these other four circuits. The plaintiffs in the instant case have a cause of action derived exclusively from the Convention, and, therefore, all state common law causes of action that might otherwise have been available to plaintiffs are preempted.
 D. Delivery of Tickets
Plaintiffs argue that if the Convention is applicable to the case at bar, TIA should not be able to rely upon the liability limitations provisions of the Convention because the plaintiffs' tickets were not "delivered" to the plaintiffs as required by Article 3 of the Convention.
If TIA did not deliver a ticket to each plaintiff, recovery is not restricted by Convention limitations of liability of Article 22. Mertens v. Flying Tiger Line, Inc., 341 F.2d 851
(2d Cir. 1965).
Article 3, (2) of the Convention provides:
 The absence, irregularity, or loss of the passenger ticket shall not affect the existence or the validity of the contract of transportation, which shall none the less be subject to the rules of this convention. Nevertheless, if the carrier accepts a passenger without a passenger ticket having been delivered he shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability.
The several courts that have interpreted this provision have generally concluded that "delivery" requires that passengers be afforded a reasonable opportunity to examine the ticket far enough in advance of departure to be able to be apprised of the limitations of the Convention and to be able to take measures to protect themselves from the limitations. See, e.g., Warrenv. Flying Tiger Line, Inc., 352 F.2d 494 (9th Cir. 1965);Mertens v. Flying Tiger Line, Inc., 341 F.2d 851 (2d Cir. 1965); DeMarines v. KLM Royal Dutch Airlines, 580 F.2d 1193 (3d Cir. 1978); Domangue v. Eastern Airlines, Inc., 531 F. Supp. 334
(E.D.La. 1981).[7] Whether a ticket has been delivered, as required by the Convention, is a question to be answered by the jury based upon the factual circumstances of each case as gleaned from the evidence. Mertens, supra. The record in the case before us reflects a disputed factual issue regarding the timely delivery of tickets to the plaintiffs. The determination of this issue is for the jury.
 II. Forrester's Directed Verdict
The trial court directed a verdict in favor of Forrester, relying upon language contained in the tour brochures issued to the plaintiffs. The relevant language reads as follows:
 RESPONSIBILITY: SKY III ENTERPRISES, the tour operator and/or the selling agent, their representatives (designated Tour Leaders and Faculty), act only as agent for the tour members in making arrangements for hotels, transportation, sightseeing, restaurant or any other services in connection with this itinerary and they will exercise reasonable care in making such arrangements. However, they do not assume any liability whatsoever, for any injury, damage, loss, accident or delay to person or property due to any act or default of any hotel, carrier, restaurant, company or person rendering any of the services included in the tour program. . . . Sky III Enterprises, the Tour Leaders and/or instructors and the tour operator(s) and any selling agent shall be rendered faultless and not responsible for any type of injury whatsoever, and will accept no responsibility for any damage or delay *Page 600 
due to sickness, pilferage, labor disputes, machinery breakdown, quarantine, government restraints, weather or any other cause beyond their personal control. The right is reserved to cancel or change itineraries. . . . In the event that services and accommodations set forth in the brochure cannot be supplied due to delays, acts, omissions, or other causes beyond its control, the operator shall use its best efforts to supply comparable service and accommodations.
. . . .
 INSURANCE; In view of statutory or contractual limitations which may apply to personal injury or property damage losses, the PURCHASE OF ACCIDENT AND BAGGAGE INSURANCE is strongly recommended. Details may be obtained from your Tour leader.
There was no evidence at trial that any plaintiff failed to receive documents including this provision.
Plaintiffs do not contend that this language was not a part of their contract with Forrester, but assert that the language is ambiguous and misleading. Plaintiffs also assert that the language constitutes an unconscionable exculpatory provision which should be denied effect by this Court. We do not agree.
An exculpatory contract provision is one that tends to excuse a defendant from alleged fault. See Taylor v. Leedy Co.,412 So.2d 763 (Ala. 1982). In Alabama, a party generally may not contract against the harm caused by his or her own negligence, with certain exceptions not applicable in the instant case. SeeAlabama Great Southern R. Co. v. Sumter Plywood Corp.,359 So.2d 1140 (Ala. 1978). However, the plain language of the disputed contract provision here does not constitute an exculpatory provision. We are of the opinion that the clear and unambiguous wording of the provision merely holds Forrester harmless for certain circumstances, including delay occasioned by machinery breakdowns, beyond her personal control. The language does not purport to relieve Forrester for damages to the plaintiffs brought upon by her actions or by events within her personal control.[8] Accordingly, we conclude that there is no basis for holding the disputed contract language unconscionable.
Having made a thorough examination of the record before us, we are of the opinion that the plaintiffs failed to provide a scintilla of evidence that Forrester breached the contract provision set out above. The record contains ample evidence that the delay of the plaintiffs' charter flight was due to mechanical breakdowns of TIA's aircraft. The plaintiffs have failed to direct us to any evidence within the record that tends to show that Forrester was responsible for the delay of the TIA charter flight or that preventing or shortening the delay was within her personal control. In fact, two class representatives called as witnesses at trial testified that they were not aware of anything Forrester could have *Page 601 
done to expedite the departure. Both Forrester and Lee Francis, TIA's regional manager, testified that shortly after the initial delay, Forrester requested that alternative transportation be supplied by TIA. Based upon this evidence and the terms of plaintiffs' contract with Forrester, we conclude that the trial court properly directed a verdict in favor of Forrester and against the plaintiffs on their breach of contract claim.
We affirm that portion of the trial court's judgment in favor of Forrester, but as to that portion in favor of TIA we reverse and remand.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
TORBERT, C.J., and MADDOX, FAULKNER, JONES, ALMON, SHORES and BEATTY, JJ., concur.
[1] Actually, there are three contractual relationships: the relationship between TIA and Forrester created by the charter agreement; the relationship between Forrester and the tour participants created by the various brochures and other documents distributed by Forrester; and the relationship between TIA and the tour participants, which is evidenced by the airline ticket. For the resolution of the issues raised in these appeals, we are concerned only with the separate relationships between the tour participants with TIA and with Forrester. We are not concerned here with the relationship between TIA and Forrester created by the charter agreement.
[2] The Airline Deregulation Act of 1978, Pub.L. No. 95-504, § 40, 92 Stat. 1705, 1744 (1978), terminated the Civil Aeronautics Board as well as some provisions of the Federal Aviation Act of 1958, 49 U.S.C. § 1301 et seq. (1976). The administration of other provisions of the Federal Aviation Act have been transferred to other federal agencies.
[3] The Warsaw Convention ("the Convention"), formally titled the "Convention for the Unification of Certain Rules Relating to International Transportation by Air," was created on October 12, 1929, and was adhered to by the United States in June 1934. An English translation is published at 49 Stat. 3014 (1934), and also reprinted in T.S. No. 876, 137 L.N.T.S. 11, and 49 U.S.C. § 1502 note (1976). The original convention is modified by the "Agreement Relating to Liability Limitation of the Warsaw Convention and the Hague Protocol" ("the Montreal Agreement"), CAB 18900 31 Fed.Reg. 7302 (1966), note following 49 U.S.C. § 1502 (1982).
[4] In Block v. Compagnie Nationale Air France, 386 F.2d 323 (5th Cir. 1967), the court opined that the ticket itself is not the contract between carrier and passenger, but evidences the contractual relationship which arises once the carrier promises to transport the passenger and the passenger consents to the transportation.
Whether the flight comes within the scope of the Convention is governed by the points of departure and arrival, as explained in Article 3 (2) of the Convention.
Moreover, it is clear from Block that the terms of the Convention apply regardless of the fact that the transportation is by air charter.
[5] The following rules and Regulations embodied in Trans International Airlines, Inc., Charter Tariff No. WW-1, effective November 12, 1978, are those relevant portions of the tariff relied upon by TIA in the instant case:
Rule No. 20 (2)(B)
 Departure Flight Delays: In the case of flight delays of more than forty-eight (48) hours beyond the departure time stated in the charter contract, TIA, upon request and at the charterer's option, will provide alternative air transportation at no additional cost to the charterer.
Rule No. 33
LIMITATION OF LIABILITY — PASSENGERS
 (A) General: As between TIA and the charterer, TIA shall be liable only for direct damage occasioned by its negligence, or the negligence of its officers, agents, servants or employees, but shall not be liable for special or consequential damages including, but not limited to, loss of services, nor in any event shall TIA be liable to the charterer for any loss or damage resulting from delays due to mechanical difficulties, weather or conditions beyond TIA's control.
[6] The English translation of Articles 19 and 20 of the Convention reads as follows:
Article 19
 The carrier shall be liable for damage occasioned by delay in the transportation by air of passengers, baggage, or goods.
Article 20
 (1) The carrier shall not be liable if he proves that he and his agents have taken all necessary measures to avoid the damage or that it was impossible for him or them to take such measures.
 (2) In the transportation of goods and baggage the carrier shall not be liable if he proves that the damage was occasioned by an error in piloting, in the handling of the aircraft, or in navigation and that, in all other respects, he and his agents have taken all necessary measures to avoid the damage.
49 U.S.C. § 1502 note (1976).
Prior to the promulgation of the Montreal Agreement (see note 3 of this opinion), Article 20 (1), above, provided a defense to the carrier to claims arising from the death of, or injury to, passengers. Pursuant to the Montreal Agreement, a carrier may not avail itself of this defense if it wishes to be protected by the limitations of liability set forth in the Montreal Agreement.
We note that the Montreal Agreement was concerned only with damages related to personal injury and death of passengers and does not speak to the damages recoverable or the continued applicability of Article 20 (1) as a defense for claims due to flight delays. We therefore conclude that the original liability limitation of Article 22, below, as well as the defense available under Article 20 (1), continues in effect for claims for flight delays.
In addition to Articles 19 and 20, we find the following Articles of the Convention applicable in the case at bar:
Article 22
 (1) In the transportation of passengers the liability of the carrier for each passenger shall be limited to the sum of 125,000 francs [approximately $8,300.00 U.S. dollars].
Article 23
 Any provision tending to relieve the carrier of liability or to fix a lower limit than that which is laid down in this convention shall be null and void, but the nullity of any such provision shall not involve the nullity of the whole contract, which shall remain subject to the provisions of this convention.
Article 24
 (1) In the cases covered by articles 18 and 19 any action for damages, however founded, can only be brought subject to the conditions and limits set out in this convention.
49 U.S.C. § 1502 note (1976).
[7] Although the delivery issue raised in the above cited cases was dealt with in relation to claims based on personal injury or death of passengers arising under Article 17 of the Convention, we see no bases for not applying the requirement of delivery under Article 3, (2), to the provisions of Article 19 concerning delay.
[8] 14 C.F.R. § 378.1 et seq., revoked and reserved effective January 1, 1979, by amendment No. 22, 43 Fed.Reg. 36, 603 (1978) but applicable to plaintiffs' tour, required Forrester to furnish a surety bond for the protection of the tour members. Forrester met this requirement. TIA argued at trial that plaintiffs' exclusive remedy was against Forrester on her bond, pursuant to § 378, but the provisions of 14 C.F.R. § 378.17 do not support this argument, nor does this section support plaintiffs' contention that the disputed liability limitation provision promulgated by Forrester is unconscionable. 14 C.F.R. § 378.17 (h) provides in regard to the contract between the tour operator and tour participants:
 That the tour operator is the principal and is responsible to the participants in making the arrangements for all tour services and accommodations offered as constituting the tour: Provided, however, that this requirement shall not preclude the tour operator from expressly providing in such contract that, in the absence of negligence on the part of the tour operator, he is not responsible for personal injury or property damage arising out of the act or negligence of any direct air carrier, hotel or other person rendering any of the services or accommodations being offered in such tour.
Clearly, Forrester was permitted by the above regulation to include the exact provision in the tour contract that the plaintiffs object to in the instant case. Also, this provision reflects a clear intent that the remedies afforded under § 378 not preclude claims against air carriers for their negligence.