David Iyegha appeals from a summary judgment for United Airlines, Inc., in his action alleging conversion and wantonness. This action arose from incidents that occurred during Iyegha's international trip, taken partly on United. The issue presented is the extent to which the Warsaw Convention limits United's liability to Mr. Iyegha.
The following is a summary of the pertinent facts that could be found by viewing the evidence in a light most favorable to Mr. Iyegha. In the summer of 1991, Mr. Iyegha purchased two airline tickets for him and his two-year-old daughter to travel to Nigeria to visit his family. The Iyeghas' itinerary took them on United from Birmingham, Alabama, to Washington, D.C., where they changed planes, and then to Heathrow Airport, London, England. The Iyeghas were then to fly British Airways from London's Gatwick Airport to Lagos, Nigeria. In Birmingham, Mr. Iyegha checked four bags to London's Heathrow and was issued boarding passes for the flights departing Birmingham and Washington, D.C.
The Iyeghas' flights to Washington, D.C., and to London's Heathrow were uneventful. Upon arrival in London, Mr. Iyegha was delayed in picking up his checked luggage by a long line at immigration. Approximately 45 minutes to an hour after arrival, the Iyeghas reached the baggage collection area. Mr. Iyegha found all of his luggage placed together in an area off the conveyer. The locks on all of the cases were secure and two of the cases were unharmed. One case, however, had been cut or torn open all the way across one side and had been tied up with a rope. The other case had a somewhat circular cut or tear that left a big hole in the side of the case. Mr. Iyegha eventually discovered that a significant number of clothes were missing from the damaged cases.
Mr. Iyegha took the damaged luggage with him on the bus to London's Gatwick Airport, assuming that he could report the damage to United at Gatwick. Upon arrival at Gatwick, Mr. Iyegha discovered that there was no United office there. A British Airways agent helped Mr. Iyegha by walking to another terminal and purchasing two new bags, for which Mr. Iyegha provided reimbursement.
Mr. Iyegha was then ready to check in for his flight to Lagos, Nigeria. However, the Iyeghas were not allowed to do so, because there were no tickets to Nigeria in their ticket materials. The United agent in Birmingham had erroneously removed the Iyeghas' British Airways tickets for the London/Lagos flight when he removed the United Airlines tickets for the Birmingham/London flights. The British Airways agent telephoned the United headquarters in the United States and was told that the Iyeghas would have to wait two days before replacement tickets could be issued. Because the Iyeghas' trip was planned to be for only two weeks, Mr. Iyegha purchased two new tickets to Nigeria, using a credit card. United later reimbursed Mr. Iyegha for the cost of the second pair of tickets, but not for the *Page 47 
interest incurred on his credit card or for a $100 processing fee that he was charged.
Mr. Iyegha filed a complaint alleging that United wrongfully "took Plaintiff's tickets in Birmingham, Alabama and ripped Plaintiff's baggage apart and took the items [of clothing] listed." The complaint alleged that this conduct constituted conversion and that United wantonly destroyed Iyegha's property and took his tickets. The court granted United's motion for summary judgment. The allegation involving the damage to the baggage and the missing items and the allegation involving the taking of the Iyeghas' tickets will be addressed separately.
 I.
The Warsaw Convention[1] applies "to all international transportation of persons, baggage, or goods performed by aircraft for hire." Convention Art. 1(1). The Iyeghas' tickets were clearly for "international transportation" as that term is used in the Convention, see Convention Art. 1(2) (defining the term); Arkwright-Boston Manufacturer's Mut. Ins. Co. v.Intertrans Airfreight Corp., 777 F. Supp. 103 (D.Mass. 1991) (shipment of a machine from the United States to Ireland is "international transportation" under the Convention), and the Iyeghas' contract with United, as evidenced by their tickets, expressly provided that carriage would be subject to the Convention's limitations on liability. The Warsaw Convention limits the amount of damages an international passenger may receive from an airline because of lost or damaged baggage.
We note initially, although the parties have been silent on the point, that this Court has held that where a plaintiff has "a cause of action derived exclusively from the [Warsaw] Convention, . . . all state common law causes of action that might otherwise have been available to [the plaintiff] are preempted." Newsome v. Trans Int'l Airlines, 492 So.2d 592, 599
(Ala. 1986). Thus, the first issue is the extent to which the Warsaw Convention controls this case. See 49 U.S.C.A. § 1502. This Court has held that an airline may limit its liability to passengers in tariffs filed and approved pursuant to the Federal Aviation Act. Eastern Air Lines v. Williamson, 282 Ala. 421, 211 So.2d 912 (1968). Further, the limitations of the tariff are valid and binding upon passengers, regardless of the passenger's lack of knowledge or assent to the provisions. Id.
Here, United submitted in support of its motion for summary judgment a copy of the contract issued to passengers. The document states: "International transportation is governed by international tariffs on file with the U.S. Civil Aeronautics Board and other governments as required" and "Presentation of this ticket for transportation on United Airlines shall constitute the passenger's acceptance of United's conditions of contract for carriage via United Airlines."
The back of the Iyeghas' boarding passes for the flight from Birmingham to Washington, D.C., which Mr. Iyegha admits to having read, states in bold print "Carriage hereunder is subject to the rules and limitations relating to liability established by the Warsaw Convention." Further, the ticket states in larger print:
 "If the passenger's journey involves an ultimate destination or stop in a country other than the country of departure the Warsaw Convention may be applicable and the Convention governs and in most cases limits the liability of carriers . . . in respect of loss of or damage to baggage. See also notices headed 'Advice to International Passengers on Limitation of Liability' and 'Notice of Baggage Liability Limitations.' "
The "Notice of Baggage Liability Limitations" provides that "[l]iability for loss, delay, *Page 48 
or damage to baggage is limited unless a higher value is declared in advance and additional charges are paid," and it states, "For most international travel (including domestic portions of international journeys) the liability limit is approximately $9.07 per pound ($20.00 per kilo) for checked baggage and $400 per passenger for unchecked baggage."See Convention Art. 22(2) and (4).[2]
The Convention provides:
 "The carrier shall be liable for damage sustained in the event of the destruction or loss of, or of damage to, any checked baggage or any goods, if the occurrence which caused the damage so sustained took place during . . . the period during which the baggage or goods are in charge of the carrier, whether in an airport or on board an aircraft."
Convention Art. 18. The Convention, then, provides the cause of action an international passenger may assert against an airline for loss of, or damage to, baggage. See Dorizas v. K.L.M. RoyalDutch Airlines, 606 F. Supp. 97 (D.C.Ill. 1984). Thus, to the extent the cause of action provided by the Convention applies in this case, any state common law causes of action for loss of, or damage to, baggage that might have otherwise been available to Mr. Iyegha are preempted. See, Newsome, supra;
Convention Art. 24(1) (providing that in "cases covered by articles 18 and 19 any action for damages, however founded, can only be brought subject to the conditions and limits set out in this convention").
As to the damaged baggage and missing items, the issue to be resolved is whether the cause of action created in Article 18 of the Convention and the accompanying liability limitations apply in this case. The operative language of Article 18 set out above clearly applies to the facts of this case; Mr. Iyegha's luggage was damaged and some of its contents were lost while in the charge of United on an international flight. Thus, the Convention's liability limitations apply unless an exception provided in the Convention is met here. The Convention provides the following exceptions:
 "(1) The carrier shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability, if the damage is caused by his wilful misconduct or by such default on his part as, in accordance with the law of the court to which the case is submitted, is considered to be equivalent to wilful misconduct.
 "(2) Similarly the carrier shall not be entitled to avail himself of the said provisions, if the damage is caused under the same circumstances by any agent of the carrier acting within the scope of his employment."
Convention Art. 25. Procedurally, then, United must, in support of its summary judgment motion, present evidence that makes a prima facie case supporting the motion — i.e., evidence suggesting that there is no genuine issue of material fact. If it does so, then the burden shifts to Mr. Iyegha to produce substantial evidence of willful misconduct.
The court scheduled a hearing on United's motion for summary judgment; at that hearing United presented a witness, who testified. Mr. Iyegha made no objections to the presentation of this evidence, and he does not take issue with the procedure. We therefore view the evidence as support for United's motion for summary judgment.
At the hearing United questioned, and Mr. Iyegha's attorney cross-examined, Ms. Donna Murrell. Ms. Murrell had been the general manager for United Airlines at the Birmingham airport for nearly 30 years at the time of the hearing. Ms. Murrell had investigated Mr. Iyegha's complaints. She concluded that there was no indication of theft or other willful employee misconduct in the handling of Mr. Iyegha's baggage. As a general matter, she conceded that United was solely responsible for the luggage *Page 49 
checked by Mr. Iyegha in this case, but she said she had verified that United's written baggage handling procedures were properly followed.
More specifically, Ms. Murrell testified that the two agents working at the check-in counter in Birmingham on the day of the Iyeghas' departure each had had over 25 years' experience, that the agents remembered Mr. Iyegha,[3] and that there was no indication of wrongdoing by them, such as a pattern of misconduct or any record of similar complaints. Ms. Murrell confirmed that Mr. Iyegha's luggage went through a baggage transfer in Washington, D.C., and that no other passengers had made similar complaints concerning damaged luggage or lost or stolen items on the Iyeghas' Birmingham-Washington flight. Ms. Murrell also said she had spoken with the general manager of United in London, and that he had stated that there had been no allegations of pilfering from the baggage aboard the Iyeghas' Washington-London flight and that he was not aware of any patterns of such conduct.
Finally, Ms. Murrell testified that she tried to, but could not, locate the missing clothing. She stated that L-shaped tears on the sides of luggage, occurring because of equipment failure, were not uncommon. She explained that, for example, "a ragged piece of metal on the baggage conveyor belts . . . will catch [the] bag, and the bag will stop and turn, and it will make an L-shape tear." She noted that with a fully loaded Boeing 747 airliner, if something gets ripped open it is more likely than not that the things knocked out "just don't show up." Ms. Murrell concluded that the tears or cuts in Mr. Iyegha's luggage were not inconsistent with those caused by equipment failure.
This testimony as to the results of United's investigation was sufficient to shift to Mr. Iyegha the burden to produce substantial evidence in opposition to the motion for summary judgment. Therefore, it was incumbent on Mr. Iyegha to present "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment [could] reasonably infer" that the actions of United or any of its employees toward the Iyeghas or their luggage constituted willful misconduct. SeeWest v. Founders Life Assurance Co. of Florida, 547 So.2d 870,871 (Ala. 1989). In opposition to the motion for summary judgment, Mr. Iyegha presented his deposition. He essentially contends that the objective facts support only one conclusion — that one or several of United's agents cut his luggage and took the clothes. In support of that conclusion, Mr. Iyegha points to these facts: United had exclusive possession of and responsibility for his checked luggage; his luggage was taken personally by a United agent before departure from Birmingham and was not put on the carousel behind the check-in counter; there was a three-hour layover in Washington, D.C., during which any problems could have been reported and/or corrected; someone must have been aware of the cut in the luggage, because one case was tied with rope; his luggage was grouped together and sitting off the mechanical carousel in London's Heathrow baggage claim area; and the mechanical conveyors at Heathrow could not have caused the damage, because, if they had, the clothes would have followed the luggage.
In light of the results of United's investigation, however, we cannot hold that this evidence is sufficient to create a genuine issue of material fact as to whether there was willful misconduct by any of United's employees. See Chukwuma v. GroupeAir France, Inc., 767 F. Supp. 43 (S.D.N.Y. 1991), aff'd, 962 F.2d 2 (1992) (willful conduct cannot be presumed on the basis that passenger's checked luggage was lost or stolen); RoyalIns. v. Amerford Air Cargo, 654 F. Supp. 679 (S.D.N.Y. 1987) (an unexplained loss of goods did not establish willful misconduct, particularly where the airline submitted evidence of its security measures). United established that the most likely explanation for what happened to the bags is that they were torn as the result of an equipment failure either when they were transferred between airplanes *Page 50 
in Washington or when they were unloaded in London. The objective facts that Mr. Iyegha observed are not inconsistent with United's explanation, and he has presented no other evidence suggesting willful misconduct on the part of any of United's agents. Thus, Mr. Iyegha has not shown that his claims alleging loss of, or damage to, his baggage and goods come within an exception to the Warsaw Convention's exclusivity and its limitation of liability.
 II.
The parties have not specifically addressed whether the Convention applies to the taking of the Iyeghas' London/Lagos tickets by United's agent in Birmingham. We have found no language in the Convention directly speaking to such a circumstance. Neither is it readily apparent that a remedy for this alleged injury may be inferred from the Convention; in the absence of any argument that such a remedy is provided, we decline to infer that it is. Therefore, we assume, for the purpose of this appeal, that the Convention does not preempt the common law claims alleged in Mr. Iyegha's complaint as to the taking of the tickets; however, we do not intend to preclude arguments to the circuit court on remand pertaining to this point. In short, United did not support its motion for summary judgment as to this aspect of the claims by showing that the Warsaw Convention preempted them.
As to the merits of the claims alleging the taking of the Iyeghas' tickets, the issue is whether the summary judgment for United was proper. United's motion for summary judgment focused on the damaged baggage and the missing items; it addressed the allegations relating to the tickets only by stating: "[T]he plaintiff admits in his September 30, 1991 letter . . . the following: 'The agent who checked us in, carelessly tore out the London/Lagos bound tickets from both of our tickets.' Such words as carelessness . . . indicate only that United, at most, was negligent." Similarly, Ms. Murrell's testimony taken at the hearing on the summary judgment motion focused on the allegations concerning the damaged baggage and the missing items. The most relevant portion of her testimony is as follows:
 "Q. Are you familiar with this claim here today that we are talking about?
"A. Yes.
 "Q. And did you have the opportunity to do an inspection — an investigation of this case?
"A. Yes.
 "Q. Tell me what you did as far as your investigation was concerned.
 "A. When I learned of the lawsuit, I talked with the employees involved. Birmingham is a very senior station. Most of our employees have been with us upwards of twenty-five years. There were two people working the counter that day. Ken Yeager had twenty-five years, and Joe Duncan has thirty-seven years.
 "Q. Those would have been the people taking the tickets and that type of thing, his luggage?
"A. Yes.
". . .
 "Q. Has Joe Duncan or Ken Yeager, the people that checked the luggage in, have they ever had any complaints against them concerning stolen luggage or anything?
"A. No."
United's allegations do not sufficiently address Mr. Iyegha's claims that the taking of the tickets constituted conversion and wantonness to present a prima facie case for summary judgment and thereby shift the burden to Mr. Iyegha to present substantial evidence supporting his claims. The fact that, in correspondence with United in which he sought to persuade it to redress his grievances, Mr. Iyegha had previously characterized the act as "careless" is insufficient, standing alone, to establish that there is no genuine issue of material fact and that United is entitled to a judgment as a matter of law. See Rule 56(c), Ala.R.Civ.P. Further, Ms. Murrell's testimony does not directly address the alleged taking of the tickets by the agents in Birmingham. Although her testimony may indirectly imply that there was no wrongdoing by either agent as to the tickets, the implication is simply too general to meet United's initial burden on the issue. *Page 51 
The failure to specifically address the tickets is somewhat understandable, considering both parties' focus on the baggage issue.
 III.
Because the Warsaw Convention applies to Mr. Iyegha's allegations concerning the damaged luggage and the missing items, and because he presented no substantial evidence that any of United's agents committed willful misconduct regarding the luggage and the missing items, the Convention preempts any state common law causes of action or remedies relating to the damaged luggage and the missing items, and its liability limitations control in this case. Accordingly, in that regard, United is liable only for the amount payable within those limitations of liability for the damaged luggage and the lost items. However, because there was no showing that the Convention applies to Mr. Iyegha's allegations concerning the taking of his London/Lagos tickets by United's agent in Birmingham, because we hold that in regard to these allegations United did not properly support its summary judgment motion, and because the allegations concerning the damaged luggage and the taking of the tickets were not separated into different counts, the summary judgment entered for United is due to be reversed.
REVERSED AND REMANDED.
HORNSBY, C.J., and HOUSTON, INGRAM and BUTTS, JJ., concur.
[1] "The Warsaw Convention ('the Convention'), formally titled the 'Convention for the Unification of Certain Rules Relating to International Transportation by Air,' was created on October 12, 1929, and was adhered to by the United States in June 1934. An English translation is published at 49 Stat. 3014 (1934), and also reprinted in T.S. No. 876, 137 L.N.T.S. 11, and 49 U.S.C. § 1502 note (1976). The original convention is modified by the 'Agreement Relating to Liability Limitation of the Warsaw Convention and the Hague Protocol' . . ., CAB 18900 31 Fed.Reg. 7302 (1966), note following 49 U.S.C. § 1502 (1982)."Newsome v. Trans Int'l Airlines, 492 So.2d 592, 595, n. 3 (Ala. 1986), cert. denied, 479 U.S. 950, 107 S.Ct. 436,93 L.Ed.2d 386 (1986).
[2] Clearly Mr. Iyegha is entitled at least to an amount that represents the limit of United's liability under this provision. After this action was filed, United tendered to Mr. Iyegha a check for $635.00, presumably to compensate him for his damaged luggage and missing items of clothing. Mr. Iyegha alleges that he has not cashed the check. The parties do not argue whether the $635 tendered to Mr. Iyegha is the correct amount due under the quoted liability limitation. We will assume that it is.
[3] The agents specifically recalled Mr. Iyegha because he had attempted to check a boxed gasoline-powered electric generator to take to his family in Nigeria. Mr. Iyegha had tested the generator and it still smelled of gasoline. The airline agents would not allow it on the aircraft, because of safety concerns.