Dennis and Christine **BAIRD** and Joe Ferguson, Plaintiffs and Appellants,

v.

**COUNTY ASSESSORS OF SALT LAKE AND UTAH COUNTIES,** Defendants and Appellees.

No. 21029.

Supreme Court of Utah.

Sept. 1, 1989.

Gary James Joslin, Salt Lake City, for plaintiffs and appellants.

Karl L. Hendrickson, Salt Lake City, for defendant and appellee Salt Lake County Assessor.

Lynn W. Davis, Michael D.S. Mack, Provo, for defendant and appellee Utah County Assessor.

STEWART, Justice:

This is an appeal by Dennis and Christine Baird and Joe Ferguson ("the plaintiffs") from an order granting summary judgment against them and in favor of the defendants, the county assessors of Salt Lake and Utah Counties. We affirm the decision of the lower court.

The facts are not in dispute. Dennis and Christine Baird owned real property in Salt Lake County, and Joe Ferguson owned real property in Utah County. The county assessors for the two counties valued their properties pursuant to Utah Code Ann. § 59–5–4 (Interim Supp.1982) (repealed) (current version at Utah Code Ann. § 59–2–303 (1987)) for the purpose of property tax assessments for the 1982 tax year. When the plaintiffs received notice of the assessment, they contested the amount of property tax due in hearings before their respective boards of equalization. The plaintiffs argued that the fair market value of their properties was unlawfully based on federal reserve notes rather than gold-valued dollars, contrary to the "standard unit of value" set forth in 31 U.S.C. § 314 (1976).[1] According to the plaintiffs' argument, a valuation based on the gold dollar standard of value stated in § 314 would result in a substantially lower tax assessment.[2]

The two county boards of equalization both declined jurisdiction over the issue, and the plaintiffs filed appeals to the Utah State Tax Commission where the cases were consolidated. The Tax Commission, dismissed the action on the ground that it was unable to grant the relief sought. The plaintiffs continued their appeal to the tax division of the District Court, which held that the plaintiffs' suit failed to state a claim for which relief could be afforded, and the court granted the county assessors' motions to dismiss.

The central issue presented on appeal is whether a tax assessment based on the value of real property stated in federal reserve notes, as opposed to gold-valued dollars, is constitutionally valid.[3]

## I. "STANDARD UNIT OF VALUE," 31 U.S.C. § 314

The plaintiffs rely on 31 U.S.C. § 314 to argue that Congress has expressly defined the standard unit of value to be a dollar consisting of "25.8 grains of gold .9 fine." They claim that this gold dollar "has been

---

1. 31 U.S.C. § 314, although not officially removed from the United States Code until 1982, *see* Act of Sept. 13, 1982, Pub.L. No. 97–258, § 5(b), 96 Stat. 877, 1068, 1070, 1074, was actually superseded in 1972. *See* Par Value Modification Act of 1972, Pub.L. No. 92–268, § 2, 86 Stat. 116, and discussion in the text of this opinion *infra*.

2. The logic of this argument is not clear. If the plaintiffs agreed to pay a lower, gold-valued assessment in the same gold dollars they espouse as the correct standard of value, their tax bill would remain the same. The Court must assume that the plaintiffs are protesting the monetary policy of the federal government rather than any specific damage to their own financial positions.

3. The plaintiffs' brief sets forth thirty issues and subissues to be resolved.

the true, official and only statutory Congressional definition of the dollar standard of value since February 12, 1873, an unbroken period of 109 years." The history of gold's role in the United States monetary system during the last century does not support this claim.

The Act of March 14, 1900, 31 Stat. 45, ch. 41, § 1, established the standard of value of the dollar at 25$^8$/10 grains of $^9$/10 fine gold.[4] From that time until 1933, the United States maintained a domestic gold standard, with the dollar convertible to gold at the statutory value. Even when the financial stress of World War I forced most nations to suspend the convertibility of their currencies into gold and place bans on gold exports to protect their reserves, the dollar remained convertible. A brief restoration of the international gold standard following the war ended in the early 1930s, when the Great Depression caused a second wave of countries to abandon the standard. The United States was among this group.

On March 6, 1933, President Franklin D. Roosevelt effectively terminated the link between the dollar and the domestic money supply by prohibiting banks from paying out gold coin and bullion. Proclamation No. 2039, 48 Stat. 1689, 1690 (March 6, 1933). On March 9, 1933, Congress ratified President Roosevelt's proclamation with legislation giving the Secretary of the Treasury the power to require all persons to surrender all gold coins, gold bullion, and gold certificates, which were to be purchased by the Treasury with paper money of the same face value. Bank Conservation Act of 1933, ch. 1, § 3, 48 Stat. 1, 2, *repealed by* Act of Sept. 13, 1982, Pub.L. No. 97–258, § 5(b), 96 Stat. 1068, 1074. With these actions, the United States domestic monetary system was no longer tied to the gold dollar.

However, the need for the standard of value established by 31 U.S.C. § 314 continued to exist beyond 1933. That standard

governed the value of the dollar for the purposes of international currency exchange. But the gold standard was damaging the United States in the international context as well. An overvalued dollar was blamed for a substantial reduction in the sale of American products, particularly farm products, in international trade. It was hoped that a devaluation would lead to more equitable international currency exchange rates and return American products to their previous levels of competitiveness.

On May 12, 1933, Congress passed the Thomas Amendment to the Agricultural Adjustment Act, which gave the President the authority to reduce the weight of the gold dollar. Agricultural Adjustment Act of 1933, ch. 25, § 43, 48 Stat. 31, 51–53. President Roosevelt subsequently declared that the dollar would be devalued to 15$^5$/21 grains of $^9$/10 fine gold. Proclamation No. 2072, 48 Stat. 1730, 1731 (Jan. 31, 1934). The weight of the gold standard of value of 31 U.S.C. § 314 was amended to reflect this devaluation. Gold Reserve Act of 1934, ch. 6, § 12, 48 Stat. 337, 342. By 1934, the dollar's standard of value was less than the value that the plaintiffs currently claim it to be.

In 1945, the International Monetary Fund (IMF) was established in an effort to better regulate the values of international currencies and thus bring more stability to international exchange. The international monetary system established by the IMF envisioned a central role for gold as the ultimate reserve asset. As a member of the IMF, the United States was required to establish a gold "par value" for the exchange of the dollar.[5] The United States was permitted to set "par value" at the gold weight that was then being used internationally in the exchange of the dollar between governments and central banks, the "standard unit of value" set forth in 31 U.S.C. § 314.

During the next two decades, gold increasingly failed to meet the IMF's expec-

---

4. From 1873 to 1900, the United States employed a bimetallic standard using gold and silver, with the dollar valued at 25$^8$/10 grains of $^9$/10 fine gold.

5. United States membership in the IMF was obtained through domestic enabling legislation entitled the Bretton Woods Agreements Act, ch. 339, § 2, 59 Stat. 512 (1945).

tations as a source of stabilization to the international monetary system. By 1971, the dollar was overvalued relative to other currencies to the extent that President Nixon was forced to stop the transfer of gold to foreign dollar holders. Congress passed the Par Value Modification Act of 1972 in an attempt to remedy the situation and stabilize the international monetary system. Pub.L. No. 92–268, § 2, 86 Stat. 116 (1972). This Act decreased the par value of the dollar to ⅟₃₈ of a fine troy ounce of gold. *Id.*

■ Section 2 of the Act, in addition to reducing the par value of the dollar, expressly provided that the new par value was to be used thereafter to define the relationship between the dollar and gold for the domestic purpose of issuing gold certificates. *Id.* at 116–17. The issuance of gold certificates was the "only domestic purpose for which it is necessary to define a fixed relationship between the dollar and gold...." S.Rep. No. 678, 92d Cong., 2d Sess., 1972 *U.S.Code Cong. & Admin. News* 2209, 2221. With the adoption of the newly defined par value, the standard of value stated in 31 U.S.C. § 314 was no longer needed. A Senate Committee report made the following analysis of Section 2:

> The gold dollar, which [prior to the passage of the Act was] equal to 15 and ⁵⁄₂₁ grains of gold nine-tenths fine, was only relevant before par values were established in the Fund and would thus be superseded by this bill.

1972 *U.S.Code Cong. & Admin.News* at 2221. Accordingly, section 2 of the Par Value Modification Act superseded 31 U.S.C. § 314.

■ Four years later, in 1976, following yet another devaluation, the IMF completely abandoned gold as a basis for the international monetary system. The par value of the dollar was thus repealed by an amendment to the Bretton Woods Agreements Act. Act of Oct. 19, 1976, Pub.L. No. 94–564, § 6, 90 Stat. 2660, 2661. Since 1976, no statutory value has existed defin-

ing a relationship between the dollar and gold.[6]

The plaintiffs argue that 31 U.S.C. § 314 was not repealed until September, 1982, when Title 31 was revised, and that the assessment at issue occurred prior to that revision. However, the legislative history of the 1982 codification of Title 31 clearly states that § 314 was "superseded by section 2 of the Par Value Modification Act," which was itself subsequently repealed "by section 6 of the Bretton Woods Agreement[s] Act." H.R.Rep. No. 651, 97th Cong., 2d Sess., Table 2A, *reprinted in* 1982 *U.S.Code Cong. & Admin.News* 1895, 2189. The legislative history further states the purpose of the 1982 revision:

> The purpose of the bill is to restate in comprehensive form, *without substantive change*, certain general and permanent laws.... [S]imple language has been substituted for awkward and obsolete terms, and *superseded*, executed, and obsolete laws have been eliminated.

1982 *U.S.Code Cong. & Admin.News* at 1895 (emphasis added).

In short, the plaintiffs' reliance on 31 U.S.C. § 314 is misplaced because that statute was superseded in 1972 and the superseding law was subsequently repealed in 1976.

## II. CONSTITUTIONALITY OF PROPERTY TAX ASSESSMENT

The plaintiffs also rely on Article I, section 10 of the United States Constitution for the proposition that states are prohibited from assessing taxes based on the federal reserve note dollar. Section 10 provides, "No state shall ... make any thing but gold and silver coin a tender in payment of debts...."

The plaintiffs construe this language to mean that a federal reserve note cannot constitutionally be used as legal tender. They wander far from the plain meaning of the provision. It is hardly surprising that there is no judicial support for the plaintiffs' position. *See Spurgeon v. Franchise*

---

6. The United States Supreme Court acknowledged the 1976 demise of the international gold standard and of an official United States price

of gold in *Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 248–50, 104 S.Ct. 1776, 1780–82, 80 L.Ed.2d 273 (1984).

*Tax Bd.,* 160 Cal.App.3d 524, 528, 206 Cal. Rptr. 636, 639 (1984), and numerous cases cited therein.

Article 1, section 10, clause 1 applies only to the states: It "is intended to prevent states from creating new forms of legal tender not recognized or authorized by the federal government." *Spurgeon,* 160 Cal.App.3d at 529, 206 Cal.Rptr. at 639. The clause is not a directive to the states to deal only in gold or silver coin; rather, it is simply a restriction on states establishing any legal tender other than gold or silver coins.

More important, section 10 does not apply to the federal government. Indeed, Congress has broad and exclusive power under Article I, section 8 of the Constitution to coin money and regulate the value thereof. *Juilliard v. Greenman,* 110 U.S. 421, 4 S.Ct. 122, 28 L.Ed. 204 (1884), held that Congress has the constitutional power to make the treasury notes of the United States the legal tender of the nation. Pursuant to this constitutional authority, Congress enacted 31 U.S.C. § 5103, which provides, "United States coins and currency (including Federal reserve notes ...) are legal tender for all debts, public charges, taxes, and dues."

In sum, a tax assessment based on the value of real property according to the stated value of federal reserve notes is authorized by statute and by the United States Constitution.

In uniformity with every jurisdiction that has considered the issue, we reject the plaintiffs' constitutional argument. Neither the statutory nor the constitutional arguments proffered by the plaintiffs support their claim that a federal reserve note is unlawful as legal tender for the assessment and payment of property taxes.

Affirmed.

HALL, C.J., HOWE, Associate C.J., and DURHAM and ZIMMERMAN, JJ., concur.